IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Dorothy L. Brown,                              )
                                               )
                    Plaintiff,                 )        No. 15 C 1794
         v.                                    )
                                               )        Judge Virginia M. Kendall
DS Services of America, Inc., d/b/a            )
Hinckley Springs,                              )
                                               )
                    Defendant.                 )

## MEMORANDUM OPINION AND ORDER

Dorothy L. Brown filed this action against DS Services of America, Inc., d/b/a Hinckley

Springs, alleging violations of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §

621, *et seq.*, the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 207, 216, the Illinois

Minimum Wage Law, 820 ILCS 105/1, *et seq.*, the Illinois Wage Payment and Collection Act,

820 ILCS 115/1, *et seq.*, and the Illinois Personnel Record Review Act, 820 ILCS 40/0.01, *et*

*seq.* DS Services moves for summary judgment. For the following reasons, the Court grants DS

Services's Motion for Summary Judgment [37] in part and denies it in part.

## BACKGROUND

The following facts are undisputed based upon the Court's review of the Rule 56

statements unless otherwise noted. DS Services of America, Inc. ("DS Services" or "the

company"), a national supplier of beverage delivery services, maintains a branch in Chicago.

(Dkt. 47, ¶ 4.) On March 1, 1980, the Chicago branch hired Dorothy Brown ("Brown") to work

in the company's computer room. (*Id.*, ¶¶ 3, 18; Dkt. 47-1, at 1.) Brown worked at the Chicago

branch in various roles over her thirty-four years with the company, eventually transitioning into

a Branch Coordinator position, the role she fulfilled when DS Services laid her off in January 2014.  (Dkt. 47, ¶ 3.)  Brown was 67 years old at the time.  (*Id.*, ¶ 75.)

**I. Brown's Employment with DS Services**

**A.  The DS Services Employee Handbook**

During her employment with DS Services, Brown received and read the company's Employee Handbook.  (*Id.*, ¶ 9; Dkt. 47-2, at 3, 17:3-16.)  The Handbook contains the company's policies on age discrimination, at-will employment, layoffs, and overtime.  (Dkt. 47, ¶ 9; Dkt. 47-2, at 46, 53, 58, 63).  Specifically, during the time period relevant to this case, the Handbook states that "[n]o supervisor, manager, or representative of DS Waters other than the Chief Executive Officer has the authority to enter into any agreement with an Associate…or to make any promises that are contrary to at-will employment."  (Dkt. 47, ¶¶ 9, 11; Dkt. 47, at 46, § 2.2.)  Further, the Handbook provides that "[n]o supervisor, manager or other representative… has the authority to make any verbal promises, commitments, or statements of any kind contrary to DS Waters' written policies, procedures, or benefits."  (Dkt. 47, ¶ 11; Dkt. 47, at 46, § 2.2.)

According to its Handbook, DS Services considers regular, full-time, nonexempt associates for layoffs on the basis of their skill, expertise, past performance, and ability. (Dkt. 47, ¶ 77; Dkt. 47-2, at 58, § 2.12.)  When two or more associates are deemed equal in these regards, the company determines layoffs based on seniority.  (Dkt. 47, ¶ 77; Dkt. 47-2, at 58, § 2.12.)

The Handbook also requires nonexempt employees to "request prior approval to work overtime and record all hours worked using the Company Time and Attendance system."  (Dkt. 47, ¶ 12; Dkt. 47-2, at 63, § 3.5.)  DS Services informs nonexempt employees that they must take at least a 30-minute lunch break for each five-hour work period.  (Dkt. 47, ¶ 13; 47-2, at 64, § 3.6)  They cannot work during lunch and need to punch out.  (*Id.*)  Management and nonexempt

associates need to verify employees' hours and ensure the accuracy of meal periods reported. (*Id.*) Brown understood these as the official overtime policies. (Dkt. 47, ¶¶ 12-13; Dkt. 47-1, at 6-7, ¶¶ 25-28.) The Handbook also disclaims that it "does not create a contract" between DS Service and the employee "for employment, compensation or benefits," and that DS Services "may revise add to or eliminate at any time any of the policies, procedures, practices and benefits in the Handbook." (Dkt. 47, ¶ 10; Dkt. 47-2, at 101.)

**B. Brown's Roles at DS Services**

Brown worked in the company's computer room for twenty-five years. (Dkt. 47, ¶ 18; Dkt. 47-1, ¶ 2.) In 2005, she transitioned into a Sales Administrator role. (Dkt. 47, ¶ 18.) At that time, she also shifted from exempt to nonexempt status, making Brown an hourly employee who needed to track her time. (*Id.*, ¶ 19.) To record her hours, Brown used either a computer-based or physical clock to punch in and out. (*Id.*)

In 2009, Brown began to report to Sales Manager Scott Hurley ("Hurley"). (*Id.*, ¶ 20.) While reporting to Hurley, Brown administered payroll, among other tasks. (*Id.*) Between June and October of 2010, Brown and Hurley arranged for Hurley to compensate Brown with time off if she worked overtime off-the-clock, even though Brown knew that they "weren't supposed to." (*Id.*, ¶¶ 23, 29; Dkt. 47-2, at 22, 100:4-6.) Brown kept overtime logs during this time. (Dkt. 47, ¶ 24.) Those logs show that she worked 25.5 overtime hours for Hurley. (*Id.*, ¶ 24; 47-1, at 19.) Around November 2010,[1] Brown became a Branch Coordinator for the Home & Office Delivery ("HOD") Department. (Dkt. 47, ¶ 25.) As a Branch Coordinator, Brown ordered supplies, prepared reports, entered data, and dealt with some customers. (*Id.*, ¶ 26.) Route Operations Manager Dale Sjoerdsma ("Sjoerdsma") supervised Brown in this role. (*Id.*, ¶ 28.) Brown did

---

[1] Brown does not remember exactly when she transitioned into this role and cautions that this may have been later than November 2010. (Dkt. 47, ¶ 25.)

not have a similar, informal overtime arrangement with Sjoerdsma and did not inform him about her arrangement with Hurley. (*Id.*, ¶¶ 23, 29; Dkt. 47-2, at 22, 101:17-19.)

At some point in 2011 or 2012, Route Operations Manager Jim Schramm, who is over 50 years old, became Brown's supervisor in her role as Branch Coordinator. (Dkt. 47, ¶¶ 28, 31.) They shared an office with other supervisors, including Jeff MacLagan. (*Id.*, ¶ 35.) Schramm and MacLagan sometimes teased Brown about her age in the year or two leading up to her layoff. (*Id.*, ¶ 35.) Schramm once commented something along the lines that the restaurant Dell Rhea's Chicken Basket had "been around forever," "probably even when Dottie was…". (*Id.*, ¶ 35; Dkt. 47-2, at 4-5, 21:21-25, 22:1-1.) Indeed, Dell Rhea's had opened in 1947, the same year that Brown was born. (Dkt. 47, ¶ 35.) Brown also says that "if someone is just goofing around, [she] just take[s] it that way." (*Id.*, ¶ 35; Dkt. 47-2, at 4, 20:11-13.)

## C. Veronica Soto's Roles at DS Services

At the time of Brown's layoff, Veronica Soto ("Soto") worked as the second and only other HOD Branch Coordinator at DS Services in Chicago. (Dkt. 47, ¶ 56.) Originally, DS Services hired Soto into a part-time role in 2007 as a Retail Branch Coordinator for the Direct Store Delivery ("DSD") Department, also referred to as a "DSD Clerk." (*Id.*, ¶ 57.) As her primary duty as a DSD Clerk, Soto made about 60-100 calls per day and spent 90-95% of her time talking to DSD customers on the phone about their orders. (*Id.*, ¶¶ 59-64.) The job posting for DSD clerk did not require Spanish language skills but DSD Manager Rick Wagner says that this was the most important factor when hiring Soto and her predecessor, both of whom spoke Spanish. (*Id.*, ¶ 61.) At that time, about half of the DSD customers spoke Spanish, while an estimated 15-20% spoke only Spanish and conducted all of their business with DS Services in

Spanish.[2]  (*Id.*, ¶ 62.)  The Chicago branch thus had at least some need for a DSD clerk with Spanish skills.  (*Id.*, ¶ 63.)

In late 2010 or early 2011, the DSD Department merged with the HOD Department, and Soto and Brown became HOD's two Branch Coordinators. (*Id.*, ¶ 65.)  For a time, they shared Sjoerdsma as a supervisor.  (*Id.*)  When she moved into the role, Soto continued to handle at least 50 calls per day from DSD customers, about half of them in Spanish.  (*Id.*, ¶¶ 66-67.)  The parties dispute whether Soto's continued phone calls to customers should be considered the responsibility of a Branch Coordinator.  (*Id.*)  It is undisputed, however, that Brown does not speak Spanish and never made DSD customer calls as Branch Coordinator.  (*Id.*, ¶ 68.)  The parties also dispute the extent to which bilingual ability was a job requirement, as Brown asserts that the first time any language requirement appeared was after Brown's termination and in response to her EEOC claim. (Dkt. 58, ¶¶ 22, 25.)  There is also a significant dispute regarding the importance of the DSD business and the degree to which DSD customers waned in the years leading up to Brown's termination, obviating any perceived need for a Spanish speaker in that role. (*See* Dkt. 58, ¶¶ 23-24.)  The parties are in agreement, however, that following Brown's termination, Soto eventually stopped making the calls. (*Id.*, ¶¶ 67-68.)  Beyond making calls in Spanish, Soto was qualified for the job and performed other Branch Coordinator responsibilities, at least in part because Brown had trained Soto.  (Dkt. 58, at 26; Dkt. 47-2, at 31, 137:4-6; Dkt. 47-10, at 23, 122:11-24.)

---

[2]  The parties also dispute whether any DSD customers specifically requested a Spanish-speaking Retail Branch Coordinator.  (*See* Dkt. 47, ¶ 62.)  At her deposition, Soto testified that some DSD customers did ask for a Spanish-speaking branch coordinator.  (Dkt. 47-10, at 10, 54:8-11.)  Wagner did not testify that this did not happen, but rather testified that he did not recall any customer making such a request.  (Dkt. 47-12, at 19, 85:23-86:1.)  Either way, this fact does not determine DS Services's need for a branch coordinator who spoke Spanish.

**D. Brown's Schedule and Hours at DS Services**

Typically, as a nonexempt employee with DS Services, Brown either worked between 8:30 am and 5:00 pm with a half hour lunch break, or between 8:30 am and 5:30 pm with an hour lunch break. (Dkt. 47, ¶¶ 14, 36.) The Chicago branch did not prepare or post a schedule for employee hours. (*Id.*, ¶ 15.) Hours varied by employee. (*Id.*, ¶ 15.) As such, Brown could manage her schedule, and accordingly arrive early or stay late. (*Id.*, ¶ 36.) Brown clocked out most of the time during lunch because she "had to take a lunch," but says she often continued to work. (*Id.*, ¶ 41.) She also sometimes forgot to clock out for lunch, ate in the front office lunchroom, or left the office. (*Id.*, ¶¶ 41-42.) Brown sometimes stayed late at the office to finish up tasks after clocking out, but she is "not sure" how often this happened and thinks this occurred "maybe" three times per week. (*Id.*, ¶ 44.) When Schramm finished his delivery route between 4:00 pm and 7:00 pm, he sometimes saw Brown in the office after 5:00 pm when he returned. (*Id.*, ¶ 47.)

Brown received reminders from DS Services' management to maintain a forty-hour work week. For example, Sjoerdsma, Brown's initial supervisor in her Branch Coordinator role, reminded her to complete her work within forty hours per week. (*Id.*, ¶ 54.) Human Resources Manager Meg Karolczak also told Brown to maintain an eight-hour workday. (*Id.*, ¶¶ 5, 54.) In December 2013, Chicago Branch Manager Jeff Ranos emailed Brown the same. (*Id.*, ¶¶ 52-54.) Still, sometimes the Regional Office Managers asked Brown to stay, but never told her that she needed to clock out first. (*Id.*, ¶¶ 45, 51.) Brown also had received approval as a Branch Coordinator to work overtime for a certain project, and she officially recorded and received pay for at least some overtime. (*Id.*, ¶ 39.) Any Regional Operations Manager could approve an overtime request, but Brown did not ask these supervisors to approve additional overtime pay.

(*Id.*, ¶¶ 40, 49, 51.)  Brown felt she had to do whatever she needed to do to get the job done, even if it took working over forty hours a week without overtime, because she "felt better making sure [she had] that extra time to get things done…"  (*Id.*, ¶¶ 45, 52-53; Dkt. 47-2, at 29, 126:1-5.)  Brown sometimes noticed alterations to her time entries, but her supervisors and branch manager only made changes to round minutes or to correct instances where she forgot to clock in or out.  (*Id.*, ¶ 55.)  Nonetheless, even if a supervisor did not review Brown's hours, payroll processed payments automatically. (*Id.*, ¶ 37.)

Except for the hours she recorded for Hurley between June and October 2010, Brown did not keep logs of the overtime hours she worked.  (*Id.*, ¶ 24; Dkt. 47-1, at 19; Dkt. 47-2, at 22, 100:7:10.)  Brown ultimately created spreadsheets estimating the overtime pay that she says DS Services owes her.  (Dkt. 53-1, at 2-12.)  She bases these estimates on her personal knowledge and belief that she worked overtime 23.5 hours per month from July 2005 to October 2013.  (*Id.*)

## II. Restructuring at DS Services

### A. Deciding to Layoff a Chicago Branch Coordinator

In January 2014, DS Services laid off employees across the country as part of companywide restructuring. (Dkt. 47, ¶ 69.)  Nationally, the layoffs affected twenty-four employees.  (*Id.*, ¶ 76.)  Of these employees, eleven were under 40 years old.  (*Id.*, ¶ 76.)  At its Chicago branch, DS Services laid off three employees besides Brown, one of whom was under the age of 40.  (*Id.*, ¶ 76.)  DS Services General Manager Bill Logan notified Regional Manager Kevin Klimczak that he would need to select one of the Chicago Branch Coordinators to lay off because the Chicago branch had two.[3]  (*Id.*, ¶ 69; Dkt. 47-5, at 6, 48:13-15.)  That same day,

---

[3] Klimczak could not recall the date when Logan notified him, but the conversation took place sometime between January 1 and January 17, 2014.  (*See* Dkt. 47, ¶¶ 69, 75; Dkt. 47-5, at 6, 48:15-16.)

Klimczak met with Chicago Branch Manager Ranos to discuss and decide the layoff. (*Id.*, ¶¶ 8, 70.)

**B. Deciding to Layoff Brown**

To make their layoff decision, Klimczak and Ranos discussed which duties each of the Branch Coordinators performed on a daily basis. (*Id.*, ¶ 70.) Brown handled some administrative tasks that Soto did not, including deposits and payroll, parking tickets, some supply orders, and a couple of select accounts. (*Id.*, ¶ 68.) Soto handled calls with Spanish-speaking DSD customers, while Brown did not. (*Id.*, ¶ 68.) At the time of Brown's layoff, Soto continued to make calls to Spanish-speaking DSD customers. (*Id.*, ¶ 71.)

Klimczak and Ranos testified that the Chicago Branch needed a Spanish-speaking Branch Coordinator in order to conduct its DSD business with Spanish-only customers. (*Id.*, ¶ 72.) After making their decision, Klimczak informed Logan that he and Ranos decided to layoff Brown and keep Soto because they needed Soto to communicate in Spanish with the DSD customers. (*Id.*, ¶¶ 56, 73.) Sjoerdsma and Schramm, respectively Brown's former Branch Coordinator supervisor and current supervisor at the time of the layoff, did not take part in the decision to layoff Brown. (*Id.*, ¶ 74.) Ranos and Human Resources Manager Meg Karolczak laid off Brown on January 17, 2014. (*Id.*, ¶ 75.)[4] At the time, Brown was 67 years old while Soto was 32 years old. (*Id.*, ¶¶ 56, 75.)

**III. Since the Layoff**

Several weeks after DS Services laid off Brown, she requested her personnel records. (*Id.*, ¶ 78.) The parties dispute whether and when DS Services provided Brown with her complete personnel file. (*Id.*, ¶ 78.) DS Services says it produced Brown's records on March 4,

---

[4] The parties dispute whether Ranos and Karolczak informed Brown that company reorganization prompted the reason for the layoff. (*See* Dkt. 47, ¶ 75.)

2014, and November 4, 2014, and could not locate additional records.  (*Id.*, ¶ 78.)  Brown says

that DS Services did not provide these files until after she filed a complaint under the Illinois

Personnel Records Review Act and the Illinois Department of Labor held a hearing on January

29, 2015.  (*Id.*, ¶ 78.)  Even so, Brown disputes that DS Services provided her complete file at

that point.  (*Id.*, ¶ 78.)  In any case, the parties do not dispute that DS Services produced the

requested records on January 19, 2016.  (*Id.*, ¶ 78.)  At the time of these filings, DS Services was

trying to remedy the overtime hours that Brown logged under Hurley, including interest and

penalties, by tendering a check to Brown in the amount of $3,500.  (*Id.*, ¶ 80.)

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  Whether a fact is material depends on the underlying substantive law that

governs the dispute.  *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (citation omitted).  "A

factual dispute is 'genuine' only if a reasonable jury could find for either party."  *Nichols v.

Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation marks

and citation omitted).  Because the plaintiff bears the ultimate burden of persuasion, the

defendant's summary judgment burden "may be discharged by 'showing'—that is, pointing out

to the district court—that there is an absence of evidence to support the nonmoving party's case."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Andrews v. CBOCS W., Inc.*, 743

F.3d 230, 234 (7th Cir. 2014).  "Upon such a showing, the nonmovant must then 'make a

showing sufficient to establish the existence of an element essential to that party's case.'"

*Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 322).

The nonmovant must "go beyond the pleadings…to demonstrate that there is evidence upon

which a jury could properly proceed to find a verdict in her favor." *Id.* at 1168-69 (internal quotation marks and citation omitted). Summary judgment is appropriate where "no reasonable jury could rule in favor of the nonmoving party." *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016) (citation omitted).

## DISCUSSION

In her Complaint, Brown sets forth five counts against DS Services. Count I alleges that DS Services intentionally discriminated against Brown on the basis of age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"). Counts II and III allege that DS Services did not compensate Brown for overtime in violation of the Fair Labor Standards Act, as amended ("FLSA"), 29 U.S.C. §§ 207, 216 and the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1, *et seq.* Count IV allege that DS Services did not pay Brown overtime in violation of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1, *et seq.* Finally, Count V seeks DS Services' compliance with the Illinois Personnel Record Review Act ("IPRRA"), 820 ILCS 40/0.01, *et seq.*

DS Services submits that no disputed, material facts remain. Specifically, DS Services contends that Brown was laid off because she did not speak Spanish, unlike her fellow branch coordinator, and for this reason the two are not similarly situated. Regardless, DS Services argues, Brown does not present evidence of pretext sufficient to overcome its contention that Spanish language skills provided a legitimate, nondiscriminatory basis for its layoff decision. DS Services also argues that Brown does not show that she worked overtime hours beyond those logged with Hurley. Lastly, DS Services asserts no dispute remains whether it provided Brown with the personnel records in question. (*See* Dkt. 38.)

## I. Count I: Age Discrimination in Employment Act of 1967 ("ADEA")

The ADEA makes it illegal for an employer to "discharge any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1); *see Gross v. FBL Financial Services*, 557 U.S. 167, 176-77 (2009) (holding that the ADEA only allows but-for, not mixed-motive, age discrimination claims); *Senske v. Sybase, Inc.*, 588 F.3d 501, 506 (7th Cir. 2009) (requiring plaintiff to show ADEA claim by preponderance of the evidence). Whether through direct or circumstantial evidence, courts must assess employment discrimination claims under the ADEA by considering all of the evidence together in order to determine whether a reasonable factfinder could "conclude that the plaintiff's… proscribed factor caused the discharge…." *See Ortiz v. Werner Enterprises, Inc.*, 843 F.3d 760, 765 (7th Cir. 2016).  Such evidence can include a direct admission by the decision-maker that he based his actions upon the prohibited animus, or a plaintiff can show evidence that allows a reasonable factfinder to infer intentional discrimination. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003), *overruled on other grounds by Ortiz*, 834 F.3d at 760.

DS Services argues that Brown's ADEA claim fails under the "direct" or "indirect" method of proving an employment discrimination claim.  Those evidentiary distinctions, however, were eschewed in the Seventh Circuit's opinion in *Ortiz*, where the court held that distinguishing between direct and indirect evidence unnecessarily "complicated and sidetracked employment-discrimination litigation." *Ortiz*, 834 F.3d at. 764.  Instead of categorizing evidence into categories, the key question is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge." *Ortiz*, 834.F.3d 760.

Although *Ortiz* did not concern the *McDonnell Douglas* burden-shifting framework applied in many employment discrimination suits, recent Seventh Circuit opinions since *Ortiz*

have reiterated that the *McDonnell Douglas* framework,[5] which involves a demonstration of a prima facie discrimination case "refers to a *common, but not exclusive*, method of establishing a triable issue of intentional discrimination." *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (emphasis added) (internal quotation marks omitted). "As *Ortiz* and our other case law make clear, however, *McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination. In adjudicating a summary judgment motion, the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David*, 846 F.3d at 224.

Because *Ortiz* did not undermine the *McDonnell Douglas* framework and the parties presented their arguments under *McDonnell Douglas*, the Court will first examine their claims under that rubric. As detailed below, under that framework, there are enough issues of material fact to create a triable issue as to whether DS Services intentionally discriminated against Brown based on her age. Under *McDonnell Douglas*, Brown must first make out a prima facie case of age discrimination. The first three elements of a prima facie age discrimination case are not in dispute. A plaintiff must show that she: (1) is a member of a protected class; (2) performed reasonably at her job; and (3) suffered an adverse employment action. *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 690 (7th Cir. 2006). The parties agree that Brown satisfies these three prongs given that she was 67 years old at the time of the layoff, the quality of her performance did not affect Klimczak's and Ranos's decision to terminate her, and her termination was an adverse employment action. (*See* Dkt. 47, ¶¶ 3, 72, 75); *see* 29 U.S.C. § 623(a)(1); *David*, 846 F.3d at 224-25.

---

[5] The *McDonnell Douglas* framework "is a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *David*, 846 F.3d at 224.

The parties, however, dispute the content of the fourth element of a prima facie age discrimination claim and whether Brown has satisfied that element. This Circuit recognizes variations of the *McDonnell Douglas* analysis when a plaintiff has been terminated pursuant to reduction-in-force ("RIF"), where the plaintiff's position is eliminated, and "mini-RIF" terminations, where the plaintiff's duties have been absorbed by retained employees not in the protected class. *Merillat*, 470 F.3d 685, 689 (7th Cir. 2006). In suits involving traditional RIF terminations, as DS Services points out, the plaintiff must show that similarly situated younger employees were treated more favorably. *Id.* When an ADEA plaintiff has been laid off as part of a mini-RIF,[6] however, "the fourth prong of the plaintiff's prima facie case is satisfied when the plaintiff demonstrates that her duties were absorbed by persons not in the protected class." *Id.* Under *McDonnell Douglas*, "[i]f the plaintiff satisfies that burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *David*, 846 F.3d at 224-25.

The modified *McDonnell Douglas* analysis tailored to mini-RIF terminations is appropriate here. There is no evidence that following Brown's termination, her duties, many of which were important administrative tasks, were rendered obsolete or automated. Instead, there is material support for the conclusion that Brown's duties were absorbed by Soto, as there was an overwhelming overlap in Brown and Soto's job responsibilities at the time Brown was terminated. (*See* Dkt. 59-11 at 99:6-111:10.) Soto, at the time of Brown's termination was 32 years old, outside of the protected class. As such, Brown has made out a prima facie case of age discrimination.

---

[6] The phrase mini-RIF is confusing, as the critical inquiry is not determining how many employees were laid off but whether the duties of those individuals were absorbed by existing staff or eliminated altogether. *Merillat*, 470 F.3d at 691 n.1 (citing *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1011 n. 5 (7th Cir. 2000).

Even if the traditional RIF standard were applied, Brown produced sufficient evidence to show that Soto was a similarly situated employee who was treated more favorably than Brown. Evaluating whether comparators are similarly situated is a "flexible, common-sense, and factual" inquiry in which courts consider whether employees held analogous jobs descriptions, standards, and supervisors, as well as experience, education, and other qualifications, "provided the employer considered these latter factors in making the personnel decision." *David*, 846 F.3d at 225-26 (citation omitted); *see Radue*, 219 F.3d at 618.

In many critical respects, Soto and Brown were similarly situated. First, they had similar experiences and qualifications, including administrative work experiences and computer training. (*See* Dkt. 58, at 26; Dkt. 47-2, at 31, 137:4-6; Dkt. 47-10, at 23, 122:11-24.) Additionally, the two women shared the same job title and there was significant overlap in their administrative responsibilities. (Dkt. 59-11 at 99:6-111:10.) Their duties, however, differed in a few respects. Brown handled a number of administrative tasks that Soto did not, like handling certain financial transactions, payroll, and accounts. Soto, on the other hand, made some calls to DSD customers in Spanish. (*Id.*, ¶¶ 68, 71-72.) These differences, however, are not significant enough to render the two women incomparable. Additionally, for a time, Brown and Soto shared a supervisor, although at the time of Brown's layoff the two women did not report to the same direct supervisor. (Dkt. 47, ¶¶ 31, 63, 67.) Considering the parity in job titles, responsibilities, and qualifications, even under the traditional RIF framework, Brown has shown a prima facie age discrimination claim.

After establishing a prima facie case of age discrimination, under *McDonnell Douglas*, Brown must supply sufficient evidence to allow a reasonable jury to determine that DS Service's proffered reason for her layoff – DS Services had a need for a Spanish speaker in the Branch

Coordinator role[7] – is mere pretext. (Dkt. 38, at 6.) There remains several factual disputes regarding whether Spanish was a requirement for the Branch Coordinator job and the extent to which the DSD business waned in the years preceding Brown's termination, disputes that could lead a reasonable jury to find that DS Services's proffered reason for termination was pretextual. When reviewing the facts in the light most favorable to Brown, these disputes preclude summary judgment.[8]

First, the parties disagree regarding the necessity of Spanish to the Branch Coordinator position. Soto initially spoke Spanish to DSD customers as part of her role as a DSD clerk and then continued to make the calls after she assumed the position of Branch Coordinator. (Dkt. 58, ¶ 22.) Therefore, as Brown suggests, her calls to those customers could be viewed as a holdover responsibility of her prior position, rather than a unified or necessary responsibility of Branch Coordinator. (*Id.*) Brown further asserts that the first time any language requirement appeared was after Brown's termination and in response to her EEOC claim. (Dkt. 58, ¶¶ 22, 25.) Furthermore, according to Brown, DS Services never required any other Branch Coordinator to speak Spanish or otherwise be bilingual. (Dkt. 58, ¶ 21.) Lastly, according to Brown's affidavit, her request for tuition reimbursement for Spanish classes was denied, as she was informed that Spanish was not a job requirement.[9] (*Id.*)

---

[7] There is no dispute that courts have found that Spanish skills can provide a legitimate, non-discriminatory reason for an employment decision. *See e.g.*, *Turner v. Swissport Cargo Service, Inc.*, No. 05 C 4203, 2006 WL 3626735, at *4 (N.D. Ill. Dec. 12, 2006) (granting summary judgment for employer where plaintiff lacked Spanish-speaking skills and employer sought Spanish speaker "to effect its goal of smooth and orderly operations"); *Watts v. Advance Transformer Co.*, No. 02 C 4603, 2003 WL 21696196, at *2 (N.D. Ill. July 18, 2003) (granting summary judgment for employer where plaintiff's argument that job did not require Spanish did not overcome factual basis that this was a legitimate job qualification while working along the Mexican-American border).

[8] Alternatively, after *Ortiz*, the Court could also reach the same conclusion by choosing to assess all the evidence cumulatively, "to determine whether it permits a reasonable factfinder to determine that her termination . . . was attributable to her age and disability." *See, e.g.*, *Aberman v. Bd. of Educ. of City of Chicago*, No. 12-CV-10181, 2017 WL 1036487, at *10 (N.D. Ill. Mar. 17, 2017). Either approach yields the same result.

[9] Brown's affidavit provides support for her claim but DS Services urges the Court to discount Brown's affidavit as "self-serving." The Seventh Circuit, however, has "repeatedly emphasized over the past decade, the term

Also in dispute is the importance of the DSD business and the degree to which DSD customers waned in the years leading up to Brown's termination. (*See* Dkt. 58, ¶¶ 23-24.) While it is not the job of the district court to assess DS Services' business decisions, when the evidence is viewed in the light most favorable to Brown, there is evidence that the number of DSD routes declined in the years and months leading up to Brown's termination and Soto completely stopped making any calls in Spanish the year following Brown's termination. (Dkt. 58, ¶ 23.)

Outside of these disputes, there is no evidence that Soto had any materially distinct or unique skills or responsibilities when compared to Brown, aside from Spanish speaking and being 35 years younger. As noted above, after Brown's termination, Soto absorbed many of Brown's responsibilities, an indicia of discrimination in and of itself. *See Merillat*, 470 F.3d at 691 n.1 ("The retention of an employee outside the protected class to perform the plaintiff's duties is nothing more than a demonstration of more favorable treatment, particularly tailored to the factual circumstances of a mini-RIF case."). Soto was able to perform these responsibilities, at least in part, because Brown had trained her. (Dkt. 58 at 26; Dkt. 47-2, at 31, 137:4-6; Dkt. 47-10, at 23, 122:11-24.) Lastly, according to Brown's affidavit, the individual who made the decision to terminate her had a reputation for spending a lot of time with certain younger female employees, additional circumstantial evidence that her termination was based on her age. (Dkt. 58, ¶ 30.)

As a result of the foregoing, a reasonable jury could conclude that DS Services's proffered reason for Brown's termination was mere pretext and that the decision to terminate her was actually based on her age. For these reasons, DS Services's Motion for Summary Judgment as to Count I is denied.

---

"selfserving" must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013).

**II. Counts II and III: Fair Labor Standards Act and the Illinois Minimum Wage Law**

Under the Fair Labor Standards Act ("FLSA"), employers must compensate their employees for work accomplished on the employer's behalf. 29 U.S.C.A. § 207. Specifically, employers shall not retain any nonexempt employee "for a workweek longer than forty hours unless such employee receives compensation" for her excess hours "at a rate not less than one and one-half times the regular rate…." 29 U.S.C.A. § 207(a). This includes work that the employer does not request, but "suffers[s] or permit[s]." 29 C.F.R. § 785.11. The Illinois Minimum Wage Law ("IMWL") requires the same and incorporates the FLSA standards, so the Court considers these claims together. *See* 820 ILCS 105/4a; *see Urnikis-Negro v. American Family Property Services*, 616 F.3d 665, 672 n.3 (7th Cir. 2010).

To prevail on a claim for unpaid overtime under the FMLA or IMWL, a plaintiff must clear two hurdles: first, the plaintiff must show that she worked overtime without compensation, and second, the employer had actual or constructive knowledge about her overtime work. *See Kellar v. Summit Seating Inc.*, 664 F.3d 169, 176-77 (7th Cir. 2011); *see e.g.*, *Blakes v. Illinois Bell Telephone Company*, 75 F.Supp.3d 792, 806 (N.D.Ill. 2014). In the first step, plaintiffs bear the burden of establishing the amount of uncompensated time. *See Brown v. Family Dollar Stores of IN, LP*, 534 F.3d 593, 595 (7th Cir. 2008). If the employer keeps accurate records, these will suffice. *Id.* If an employer kept inaccurate records, the plaintiff must "produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *See Melton v. Tippecanoe Cty.*, 838 F.3d 814, 818 (7th Cir. 2016) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), *superseded on other grounds by* Portal–to–Portal Act of 1947)); *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690 (7th Cir. 2010) (affirming summary judgment grant where employee failed to put information in the record to

17

support the overtime he claimed and thus fell short of FLSA burden); *see also Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059-1060 (8th Cir. 2014) (affirming summary judgment grant where plaintiff failed to account for how he arrived at his estimate of regularly working between forty-five and seventy hours a week).

Under this standard, a plaintiff may rely on her recollection, but not on speculation. *See e.g.*, *Brand v. Comcast Corporation*, 135 F.Supp.3d 713, 742 (N.D. Ill. 2015) (internal citation omitted). "Bare allegations" and "vague undocumented estimates" do not survive summary judgment. *See e.g.*, *id.* (internal citations and quotations omitted); *Golden v. World Sec. Agency, Inc.*, 884 F.Supp.2d 675, 700-01 (N.D. Ill. 2012) (granting summary judgment where employees provided spreadsheet containing numbers for overtime, but failed to provide foundational testimony to explain calculations); *Gatto v. Mortgage Specialists of Illinois, Inc.*, 442 F.Supp.2d 529, 535-36 (N.D. Ill. 2006) (finding that plaintiff's mere declaration that she worked more than forty hours per week "nearly every week" does not create genuine factual issue). For example, a plaintiff stating that he took lunch breaks "maybe once or twice, maybe three times a month," or saying that he worked "[o]ver [the course of] four years, probably three years' worth of his lunches" provides mere speculation as to how a plaintiff reached his estimates. *See e.g.*, *Brand*, 135 F.Supp.3d at 742. Plaintiffs can, however, create a genuine issue of fact where an employee supports his approximations with timesheets noting "triggering factors" from which overtime could be inferred, such as after-school events requiring someone to stay late to work at a school. *See e.g.*, *Blakes*, 75 F.Supp.3d at 806. If a reasonable inference can be drawn from the employee's evidence, the burden then shifts to the employer to "come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the

inference . . . ." *See Melton*, 838 F.3d at 818 (quoting *Mt. Clemens*, 328 U.S. at 680, 686–87); *Family Dollar Stores*, 534 F.3d at 595.

The records suggest that DS Service's Chicago Branch did not maintain accurate records of the hours worked by nonexempt employees. The branch did not make and post schedules, so these employees managed their own time and worked flexibly. (Dkt. 47, ¶¶ 14-15, 36.) Brown sometimes noticed alterations to her time entries, which raises a question about their accuracy. (*See id.*, ¶ 55.) Payroll still processed payments even if supervisors did not review the hours logged, so it also seems that the official records did not always benefit from an added layer of review to confirm their accuracy before entry. (*See id.*, ¶ 37.) Brown also suggests that supervisors felt the pressure to limit on-the-clock overtime, even if, in practice, they expected employees to work more than forty hours a week to do their work. (*See id.*, ¶ 52.) Hurley's arrangement with Brown exemplifies the possibility of such a discrepancy. (*See id.*, ¶¶ 23-24, 29.) Because the Court questions the accuracy of DS Services' records, Brown must "produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference" in order to carry her burden of establishing the amount of uncompensated time that she worked. *See Family Dollar Stores*, 534 F.3d at 595; *Melton*, 838 F.3d at 818.

To show the amount and extent that she worked overtime without compensation, Brown mostly relies on her memory, which is permitted. *See e.g.*, *Brand*, 135 F.Supp.3d at 742. She kept some logs of her overtime hours, but only for the arrangement she had with Hurley, and even then only recorded 25.5 hours when she states that she worked more overtime than this. (*See* Dkt. 47, ¶ 24; Dkt. 47-1, at 19; Dkt. 47-2, at 22, 100:7:10; Dkt. 53-1, at 2-12.) She also provides that, after she became a Branch Coordinator, her supervisor Schramm sometimes

noticed her in the office still after 5:00 pm when he returned from his delivery route.  (*See* Dkt. 47, ¶¶ 23, 47.)  Yet beyond this, Brown cannot account for her projected overtime hours.

Except for the 25.5 hours recorded pursuant to her informal arrangement with Hurley, Brown did not keep logs of her overtime hours when she worked at DS Services.  (*Id.*, ¶ 24; Dkt. 47-1, at 19; Dkt. 47-2, at 22, 100:7:10.)  Brown supplemented the record with spreadsheets projecting that DS Services owes her compensation for at least 799 hours of overtime between January 2011 and October 2013.  (Dkt. 53-1, at 2-12.)  To calculate this, Brown estimates that she worked 23.5 hours of overtime each month.  (*Id.*)  However, Brown does not provide a basis for why she estimates that she worked 23.5 hours per month.  (*See id.*)  Brown produces her estimates akin to the plaintiff in *Golden*, whose spreadsheet containing overtime figures without foundational testimony to explain the calculations did not suffice to create a genuine issue of fact.  *See e.g.*, 884 F.Supp.2d at 700-01.  And, as in *Gatto* and *Brand*, Brown does not create a fact dispute simply by declaring that she worked a certain number of overtime hours per week "nearly every week," or broadly estimating that she worked through her lunch breaks all but a few days per month, totaling "probably three years' worth of his lunches."  *See e.g.*, 442 F.Supp.2d at 535-36; 135 F.Supp.3d at 742.  Instead, Brown says that she usually worked through lunch and ate at her desk, but sometimes she ate in the lunchroom or left the office, without discerning what might prompt either circumstance.  (Dkt. 47, ¶¶ 41-42.)  She also asserts that she stayed late at the office to finish up tasks after clocking out, but is "not sure" how often this happened, and thinks this occurred "maybe" three times a week.  (*Id.*, ¶ 44.)  She does not point to any "triggering factors" that could establish why she thinks she worked overtime that often, namely why she worked overtime on certain days at particular times.  *See e.g.*, *Blakes*, 75 F.Supp.3d at 806.

Accordingly, Brown's assertions amount to speculation and do not "show the amount and extent of [overtime] work as a matter of just and reasonable inference." *See Melton*, 838 F.3d at 818; *Turner*, 595 F.3d at 690; *see e.g.*, *Brand*, 135 F.Supp.3d at 742. Because she does not meet her burden, DS Services need not provide evidence of the precise amount of work performed. *See Melton*, 838 F.3d at 818. Nor must the Court reach the question of whether the employer had actual or constructive knowledge about Brown's overtime work. *See Kellar*, 664 F.3d at 176-77. As no genuine issues of material fact remain as to this issue, the Court grants summary judgment for DS Services on Brown's FLSA and IMWL claims. *See Melton*, 838 F.3d at 818; *Turner*, 595 F.3d at 690; *see e.g.*, *Brand*, 135 F.Supp.3d at 742; *Golden*, 884 F.Supp.2d at 700-01; *Gatto*, 442 F.Supp.2d at 535-36; *see also Urnikis-Negro*, 616 F.3d at 672 n.3.

### III. Count IV: Illinois Wage Payment and Collection Act

Plaintiffs can recover wages owed to them by their employers pursuant to the Illinois Wage Payment and Collection Act ("IWPCA"). 820 ILCS 115/1, *et seq.* In contrast to the IMWL, which ensures that employers pay hourly employees a minimum rate for overtime pay, the IWPCA "does not establish a substantive right to overtime pay." *See e.g.*, *Camilotes v. Resurrection Health Care Corp.*, No. 10 C 366, 2012 WL 2905528, at *4 (N.D.Ill. July 16, 2012) (internal citations omitted). Rather, an IWPCA claim will fail unless the plaintiff shows that the defendants owe her compensation pursuant to an employment agreement, which can manifest based on mutual assent and need not involve a written contract. *See* 820 ILCS 115/2, 115/3; *see e.g.*, *Enger v. Chicago Carriage Cab Co.*, 77 F.Supp.3d 712, 716 (N.D.Ill. 2014), *aff'd Enger v. Chicago Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016). Mutual assent can be implicit. *See e.g.*, *id.*

In an IWPCA claim, an employee handbook itself does not create an "employment agreement." *See e.g.*, *Pavur v. Illinois Bell Telephone Company*, No. 15 C 2796, 2016 Wl 278886, at *2-3 (N.D.Ill. Jan. 21, 2016) (holding that handbook disclaiming itself from forming an employment contract and providing a policy that reiterates a defendant's statutory obligations "does not create a separate, actionable employment agreement" under the IWPCA); *Brand v. Comcast Corporation*, No. 12 C 1122, 2013 WL 1499008, at *3 (N.D.Ill., Apr. 11, 2013) (internal citations omitted). Further, a handbook that authorizes only specific officers to enter into an employment agreement prevents the employee from forming an employment agreement with someone other than one of those officers. *See e.g.*, *Camilotes*, 2012 WL 2905528, at *6.

Here, DS Services's Employee Handbook expressly prohibits supervisors, managers, or other representatives other than the Chief Executive Officer from entering into agreements with employees or making promises, verbal or otherwise that contradict the company's policies. (Dkt. 47, ¶¶ 9, 11; Dkt. 47-2, at 46, § 2.2.) The Handbook also requires nonexempt employees to accurately record their overtime hours and to request approval in advance to work these hours. (Dkt. 47, ¶ 12; Dkt. 47-2, at 63, § 3.5.) The Handbook further disclaims that it "does not create a contract between [the company] and [the employee] for employment, compensation or benefits." (Dkt. 47, ¶ 10.) Taken together, Brown's supervisors did not have the authority to assent to an employment agreement, tacitly or otherwise, that allowed Brown to work more overtime than she accurately recorded. *See e.g.*, *Comcast*, 2013 WL 1499008, at *3; *Camilotes*, 2012 WL 2905528, at *6. The Employee Handbook itself also does not create an "employment agreement." *See e.g.*, *Pavur*, 2016 Wl 278886, at *2-3. In spite of this, DS Services offered to tender Brown compensation for the overtime she logged under Hurley's supervision, including interest and penalties, in the amount of $3,500. (Dkt. 47, ¶ 80.) To the extent that this does not

moot Brown's IWPCA claim (*see e.g.*, *Hernandez v. PeopleScout, Inc.*, No. 12 C 1228, 2012 WL 3069495, at *2-3 (N.D.Ill. July 24, 2012)), Brown does not and cannot point to an employment agreement that she formed with DS Services, so her IWPCA claim cannot succeed. *See* 820 ILCS 115/2, 115/3; *see e.g.*, *Enger*, 77 F.Supp.3d at 716. The Court grants summary judgment for DS Services on Brown's IWPCA claim.

## V. Count V: Illinois Personnel Record Review Act

Under the Illinois Personnel Record Review Act ("IPRRA"), employers allow an employee upon request "to inspect any personnel documents which are, have been or are intended to be used in determining that employee's qualifications for employment, promotion, transfer, additional compensation, discharge or other disciplinary action." 820 ILCS 40/2. Employers shall provide the files within seven working days of the request, or fourteen days if the employer needs more time. *Id.* Willful and knowing violations can result in the award of attorney's fees and actual damages. 820 ILCS 40/12(d).

A plaintiff who gets to see her complete file, without a showing of actual damages, does not argue an IPRRA claim. *See e.g.*, *Scurto v. Commonwealth Edison Co.*, No. 97 C 7508, 2000 WL 1624827 (N.D.Ill. Sept. 28, 2000), *aff'd Scurto v. Commonwealth Edison Co.*, 37 Fed.Appx. 213 (7th Cir. 2002). A plaintiff cannot prevail on an IPRRA claim where she cannot identify the missing files and does not show that she did not gain access to these files during discovery, nor that she has been harmed by the nondisclosure. *See e.g.*, *Scurto*, 2000 WL 1624827; *Milnes v. AIMCO/Bethesda Holdings, Inc.*, 805 F.Supp.2d 525, 526-27 (N.D.Ill. Apr. 4, 2011).

Brown disputes that DS Services provided her complete personnel files when she first requested them. (Dkt. 47, ¶ 78.) Regardless, the parties do not dispute that DS Services produced the requested records on January 19, 2016. (*Id.*, ¶ 78.) Nor does Brown identify the

missing files or articulate the harm she suffered.  (*See* Dkt. 46, at 15.)  Rather, Brown argues that because DS Services failed to satisfy her request for her complete files until January 2016, she shows the company's willful violation of IPRRA.  (*See id.*)  To the extent that DS Services did not provide Brown with her complete personnel files upon her request, it is possible that the company did so with neglect or carelessness.  Brown does not point to evidence of DS Services's knowledge of its failure to provide a complete personnel file, and instead reasons the company's willfulness by assertion.  (*See id.*)  Brown therefore cannot move forwards on an IPRRA claim. *See e.g.*, *Scurto*, 2000 WL 1624827; 805 F.Supp.2d at 526-27.  The Court accordingly grants summary judgment for DS Services on Brown's IPRRA claim.

## CONCLUSION

For these reasons, the Court denies DS Services's Motion for Summary Judgment against Brown as to Count I and grants the Motion as to Counts II-V of her Complaint.


Virginia M. Kendall
United States District Court Judge
Northern District of Illinois


Date: __3/30/2017_